GATES, Respondent, vs. NORTHERN PACIFIC RAILROAD COMPANY, Appellant.

*September 8 — September 22, 1885.*

*(1) Assignment of cause of action: Parties. (2) Railroads: Navigable river: Drawbridge. (3) Damages.*

1. A cause of action for the obstruction of a navigable river was assigned absolutely, in consideration of the assignee applying the net proceeds of the claim to the payment of certain debts of the assignors and paying any overplus to such assignors. *Held,* that the assignee might maintain the action in his own name.

2. When a railroad bridge with its draw closed is an unlawful obstruction of a navigable river, parties using the river are not bound to notify the railroad company to open the draw every time they wish to pass through; nor are they bound to open the draw themselves; nor are they bound to use only such vessels as can pass under the bridge when the draw is closed.

3. Where, by reason of the maintenance by defendant of an obstruction in a navigable stream, the plaintiffs were so delayed in their business of rafting logs in the season of high water that they were compelled to do a portion of such work at increased expense in the ensuing season of low water,— such seasons being of usual occurrence each year,— such increase in the expense of the work may be recovered as damages in an action for the obstruction.

APPEAL from the Circuit Court for *Douglas* County.

Action to recover damages on account of the obstruction of a navigable river by the defendant by failing and neglecting to open the draw in a bridge constructed by it over such river. The facts are stated in the opinion. There was a

verdict for the plaintiff assessing his damages on account of the loss of time of the tugs and men employed by plaintiff's assignors, while delayed by the neglect or refusal of the defendant to open the bridge when the stream at that point was wanted for navigation by such assignors, at the sum of $343.13; and the additional damages on account of the delay, hindrance, and consequent loss in carrying on the business, at the sum of $1,500, being the extra cost of handling 10,000,000 feet of logs during the summer of 1883. From the judgment on the verdict for the sum of $1,843.13, the defendant appealed.

For the appellant the cause was submitted on briefs by *C. L. Catlin.*

For the respondent there were briefs by *S. Bacon* and *S. F. White,* and oral argument by *Mr. White.*

ORTON, J. The plaintiff sued as assignee of the firm of Maxim, LeMay & Crane. The assignment was absolute, in consideration of applying the net proceeds of the claim in suit to the payment of certain claims against the said firm, and paying over the overplus to said firm.

The appellant company constructed a bridge on the line of its road over the Nemadji river, a short distance from its mouth, where it empties into Lake Superior, at Superior city, with a draw in it to admit the passage of boats and vessels and other craft navigating said river. The assignors were engaged during the years 1882 and 1883 in the business of receiving logs, which were run down said river at a point about two miles above said bridge, and there assorting them and joining them together in rafts and towing the same by means of tug-boats into the bay of Superior, and thence to the mills of their owners. While they were engaged in so sorting, booming, rafting, towing, and delivering logs during the fall of 1882, they were delayed by the neglect and refusal of the defendant company to open the draw of

said bridge, or to allow the same to be opened, on the following times and occasions: On September 2d the tug John Pridgeon, in their employ, with a tow of logs, a period of four hours; on September 29th, twenty-four hours. During the spring of 1883, April 24th, the tug Nellie Catton, in the same manner, six hours, and on April 30th, two hours. On May 2d, the tug John Martin, fourteen and a half hours; and on May 5th, tug Minnie Le Mont, two hours. By these delays the assignors lost in the payment of the tugs a certain amount per hour, and in the payment of their employees so kept idle, a certain amount per hour. By these delays in the spring of 1883 the assignors were unable to retain and obtain tugs for their necessary work, and were compelled to go a long distance to obtain a tug with a joint in its smoke-pipe so as to be lowered and made to go under said bridge with the draw closed, and by such delays their work under certain contracts for delivering logs was so hindered and impeded during the spring freshets and high water in said river that they were compelled to do a large part thereof, which might otherwise have been done at such favorable season, later in the season, at a time of low water, which cost them twenty-three cents per thousand feet of logs more than it would have cost but for such delays during such high water, and they thereby suffered so much loss and damage. These are the main facts stated in the complaint.

We have carefully read the testimony, and we are satisfied that the verdict of the jury, both as to the amount of the plaintiff's damages and the cause thereof, was warranted by competent testimony, and it is useless to say more on the merits of the case or questions of fact.

A demurrer to the complaint was overruled, and this is assigned as error; but inasmuch as the same questions were raised on the trial, and in instructions to the jury, such error need not be specially considered.

The special exceptions will be disposed of by the consideration of the questions of law involved.

1. Did the assignment to the plaintiff of the cause of action entitle him to sue alone? The assignment certainly entitles him to the moneys to be recovered in the action. It is correctly said by the learned counsel of the respondent, in their brief, that the reasoning in the case of *Hooper v. C. & N. W. R. Co.* 27 Wis. 81, would seem to confer such right on the plaintiff as assignee. In that case the shipper, or consignor, was allowed to sue alone for lost goods, for the reason that the consignee did not object, and without his objection it was presumed that it was with his knowledge and consent, and that the suit was prosecuted for his benefit by the consignor as his trustee. The case of *Smith v. C. & N. W. R. Co.* 23 Wis. 267, seems to be in point. The assignor of property and choses in action to pay debts brought the suit. Dixon, C. J., said in the opinion: "The interest of the plaintiff is residuary and equitable merely. He has no legal interest in the claim, the title being vested absolutely in the assignee, who alone can bring suit upon it and control the proceedings for its collection." In *Wooliscroft v. Norton,* 15 Wis. 198, an account was placed in the hands of another to collect the same, and pay the debt of the owner of the account to himself. It was held that such other person was the proper person to sue. See, also, *Allen v. Kennedy,* 49 Wis. 549; *Waterman v. C., M. & St. P. R. Co.* 61 Wis. 465; *McArthur v. G. B. & M. Canal Co.* 34 Wis. 139; *Vimont v. C. & N. W. R. Co.* 64 Iowa, 513. From these authorities, and others which might have been cited, and from principle, it is clear that the plaintiff had the right to sue.

2. Was it the duty of the assignors to have notified the company to open the draw of the bridge every time they wished to pass through with the tug-boats? If this bridge, with the draw closed, was an unlawful obstruction of the

river, except when it was necessary to be used by the defendant company, then it was a nuisance, and the company created it and was responsible for it. In such cases no notice to remove or abate it was necessary. *Slight v. Gutzlaff*, 35 Wis. 675, and cases cited. When the draw was closed it was a complete obstruction to the navigation of the river by tug-boats as they are usually and generally constructed, and a nuisance *per se*, and there is no principle which could exonerate the company from removing or abating it without notice at any time when it was necessary or proper for the river to be so used. On this question the late cases of *Weisenberg v. Winneconne*, 56 Wis. 667, and *Barnes v. Racine*, 4 Wis. 454, are in point. The obstruction and delay would seem to be sufficient burden upon navigation without requiring a suffering party to delay and be damaged still more by the time required to give the offending party notice to abate the nuisance.

3. Ought the assignors to have opened the draw every time they wished to pass the bridge with a tug-boat? If any such duty was imposed upon them, it was by virtue of their right to abate the nuisance and not suffer unnecessary damage by the delays occasioned thereby by reason of its continuance. This principle would scarcely be a safe one in such a case where the company had the right to keep the draw closed when necessary for their use in running railway trains across the bridge. It follows, then, that if the assignors ought to have opened the draw at such times, as a temporary and necessary abatement of the nuisance as to them, it was their duty also to close it again after they had passed through, and thus become a party responsible to other persons navigating the river in a similar manner for the nuisance. This certainly the law cannot require. But, again, it would be exceedingly dangerous for all persons navigating that river to open the draw for themselves whenever they should wish to pass the

bridge. A train of cars might rush upon the bridge without notice just when the draw should be so open. For those navigating the river to be charged with this fearful responsibility, and with notice as to just when the company may so run its trains across the bridge, and with the duty to notify approaching trains from either way to stop until the draw is closed, would be unlawful imposition. *White v. Chapin*, 102 Mass. 138. But it is useless to further discuss such a proposition against all reason and authority. *Weisenberg v. Winneconne, supra*. It was clearly a glaring omission of duty on the part of the company not to have had some one at the place to open the draw when so necessary. The general question of the right of a railway company or a municipal corporation to temporarily obstruct navigable rivers by bridges, and of the serviency of navigation to railway travel and transportation, has been too well settled since the *Wheeling Bridge Cases*, 9 How. 647, to be now opened. Railways may so obstruct and delay navigation to an extent reasonably necessary by bridges and other constructions, but no further. Tested by this invariable rule, the company, in the instance complained of, had no right to delay the tug-boats used by assignors longer than the bridge could have been opened by the company by due diligence.

4. If it was necessary that the assignors should procure tug-boats with adjustable smoke-pipes that could pass under the draw closed, in order to avoid unnecessary delay and damage, the evidence seems to be that they did so as soon as they could. But does the law in such a case impose the duty upon those navigating that river to resort to extraordinary and unusual methods of tug-boat construction in order to avoid delay and damage? We think not. The assignors had the right to use common and ordinary tugs in their business. They were not required to go a long distance and be at expense to find tugs which could be used on

that river without opening the bridge. The company may as well claim that they need not have draws in their bridges over navigable waters, because boats and vessels might be so constructed as to pass under them. The company must adapt such constructions to the necessities of such boats and vessels as usually and commonly navigate such waters.

5. There is no contest over the first class of damage mentioned in the complaint, but as to the second class of damage the learned counsel of the appellant contends that such was too remote and speculative. The verdict of the jury divided these damages, and found — *first,* for that resulting at the time from delays at the bridge; and, *secondly,* that arising from the consequent loss to the assignors in carrying on their business, from such delays and hinderances. These last damages seem to have been computed as the additional cost to them of getting out their logs in a season of low water, made necessary by such delays in the season of high water. That such seasons of high and low water usually occur every year, or in most years, in respect to our rivers in this state and Minnesota, is of common knowledge. It is also common to adjust and regulate the lumber business upon such rivers by the reasonable expectation that such seasons will occur, and their occurrence may well be considered to be in the ordinary course of nature, and may be presumed to be considered, contemplated, and anticipated by contracting parties in relation to such use of the rivers, and are so common and usual as not to form an unexpected, uncertain, speculative, and independent cause intervening to break the connection and continuity between the delays in the season of high water as the cause, and the increased cost of the work in the season of low water as the consequence. The learned counsel of the appellant plausibly insists that the company shall not be held responsible for providential droughts, or such drought as occurred in the fall of the year 1883, which was the cause of the in-

creased cost and damage to the assignors. That might be so if such low water was an unusual and extraordinary occurrence in that year, not to be anticipated or expected. If we applied the rule in cases of contract to this case, we might well say that at the time the company was causing these delays in the spring, it might have anticipated and expected that the assignors would be compelled thereby to carry on their business in the fall or season of low water at a greatly increased cost. It follows that, according to the rule laid down in *Brown v. C., M. & St. P. R. Co.* 54 Wis. 342, these damages are the natural, proximate, and direct consequence of these delays. See, also, *Cockburn v. Ashland Lumber Co.* 54 Wis. 619.

6. Intimately connected with this question is whether these damages are speculative, and cannot be certainly ascertained. Are they ideal, theoretical, or imaginary? If so, they cannot be recovered. If this suit had been brought after the first damages had been suffered, and before the last had occurred, and it had been sought to be proved what damages the assignors would probably suffer by increased cost of their work in the fall of that year, occasioned by such delays by reason of low water, such damages might be called speculative with better reason, for then such damage might or might not have occurred. It might have been an exceptional year of high water the whole year, and other circumstances might not have been present. But these natural occurrences all took place, and without the fault of the assignors they were compelled to suffer this increased cost of their work. What before might have been speculation had become fixed facts, which formed the *data* of certain estimation and computation of the exact loss. Similar damages have been allowed and sanctioned by this court, whatever may be the conflict of authority elsewhere, but we do not find much conflict on the question. In *Shepard v. Milwaukee G. L. Co.* 15 Wis. 318, the pecuniary loss, inconvenience, and annoyance experienced by the plaintiff

in his mercantile business, by the defendant's refusal to furnish gas, were allowed as consequential damages. In *Jolly v. Single*, 16 Wis. 280, the defendant took wrongful possession of a mill rightfully in the possession of the plaintiff, and detached therefrom certain machinery, when the plaintiff had logs to saw in said mill, which he was thereby prevented from doing. The defendant asked the instruction that the plaintiff could only recover the cost of restoring the mill to running order, or the value of the property carried away. Mr. Justice PAINE said in his opinion: " Such a rule applied to such a case would be grossly unjust. A party is in possession of a mill, and has hired a large number of men to work it. He has on hand a large number of logs, which he is entitled to saw, and in sawing which he can earn a certain sum each day over and above all expenses." These were the elements of the damages found by the jury and approved by this court in *Kinney v. Crocker*, 18 Wis. 74. Evidence of the nature and extent of the plaintiff's business, and the loss resulting to him from inability to attend to it by reason of the injury, was decided to be proper, and the instruction that "if a man had an ordinary business yielding ordinary receipts he would be entitled to recover the diminution of those receipts resulting from his inability to attend to his business, occasioned by the injury," was approved. See, also, *Flick v. Wetherbee*, 20 Wis. 392; *Blair v. M. & P. du C. R. Co.* 20 Wis. 262; *Richardson v. Chynoweth*, 26 Wis. 656; *Ripon v. Bittel*, 30 Wis. 614; *Luck v. Ripon*, 52 Wis. 196; and *Bierbach v. Goodyear Rubber Co.* 54 Wis. 208.

Finally, we think the evidence shows that the assignors did all that the law required them to do to prevent the damages they suffered. The case was very ably presented on both sides. We find no error in the record.

*By the Court.*— The judgment of the circuit court is affirmed.